# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AT ENGINE CONTROLS LTD., <br>     Plaintiff, <br><br>      v. <br><br> GOODRICH PUMP & ENGINE CONTROL <br> SYSTEMS, INC.,[1] <br>     Defendant. | No. 3:10-cv-01539 (JAM) |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. #180) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. #179)

This case concerns a dispute between plaintiff AT Engine Controls Ltd. ("ATEC") and defendant Goodrich Pump & Engine Control Systems, Inc. ("GPECS") regarding technology in a digital electronic control unit ("DECU") that is used in certain military aircraft engines. The companies are longtime business partners, and they worked together decades ago to develop the DECU. But eventually, GPECS developed a new competing digital electronic control unit, the EMC-100. To develop the EMC-100, GPECS used certain DECU design documents.

In this lawsuit, ATEC claims that GPECS's usage of DECU design information to create the EMC-100 constitutes misappropriation and misuse of ATEC's proprietary information in violation of a longstanding agreement between the parties. I conclude that, whatever merit there may or may not be to ATEC's claims, there is no genuine dispute of material fact that all of its claims are barred by the applicable statute of limitations. Accordingly, I grant GPECS's motion for summary judgment and deny ATEC's motion for summary judgment.

---

[1] The Clerk is directed to amend the case caption to remove former defendant Goodrich Corporation. *See* Doc. #168.

**BACKGROUND**[2]

**1.      The DECU**

In April of 1979, two entities—a British company named Hawker Siddeley Dynamics

Engineering Ltd. ("HSDE") and an American company named Chandler Evans Inc. ("CECO")—

signed an agreement to "develop, manufacture and sell fuel control systems for gas turbines."

Doc. #257-41 at 3. These two companies are predecessors to plaintiff ATEC and defendant

GPECS, respectively.[3] Their agreement set forth the basic terms under which the companies

would jointly develop a full authority digital engine control ("FADEC") system for any aircraft

engine application program that CECO was awarded.

The FADEC system is a fuel control system used in helicopter engines, and it has two

components: a hydro-mechanical fuel metering unit and a digital electronic control unit

("DECU"). The metering unit pumps fuel to the helicopter's engine, while the DECU monitors

engine performance and controls the distribution of fuel to the engine.

Under the 1979 agreement, CECO (predecessor to defendant GPECS) was responsible

for defining the system requirements for the FADEC, determining how the various elements

would interact with each other, designing and manufacturing the metering unit, and ultimately

marketing and selling the complete FADEC to various aircraft manufacturers, militaries, and

other customers. HSDE (predecessor to plaintiff ATEC) was responsible for developing the

---

[2] The facts set forth in this section are undisputed or, where disputed, are stated in the light most favorable to ATEC. In view of the fact that this ruling grants GPECS's motion for summary judgment solely on statute of limitations grounds, I have emphasized the facts most pertinent to that issue. I do not necessarily address all portions of the factual record that might be relevant to the various other arguments advanced by both parties.

[3] Over the years, the assets (or at least some portion of the assets) of HSDE and CECO passed through various entities, with HSDE assets eventually becoming part of plaintiff ATEC and CECO assets eventually becoming part of defendant GPECS. *See* Doc. #257-1, ¶¶ 1-17. The parties in this litigation disagree about the nature of some of the transactions that have occurred over the years, and they also disagree about whether ATEC is a proper assignee of the 1979 agreement. But these disputes are not relevant to the statute of limitations issue on which I resolve GPECS's motion for summary judgment. Accordingly, for purposes of this opinion, I assume—without deciding—that ATEC is the proper successor to HSDE and that GPECS is the proper successor to CECO.

2

hardware and software design for the DECU (based on CECO's requirements), which it would then produce and sell to CECO. *See* Doc. #257-41 (1979 Agreement) at 6–7.

The 1979 agreement contained two provisions concerning confidentiality obligations and restrictions on the use of proprietary information. Paragraph 1 of Section VII of the agreement provided that "CECO and HSDE shall treat as confidential the special knowledge, data and technical information that will be supplied to it pursuant to this Agreement, and shall not knowingly disclose or permit the disclosure of the same, or any part thereof, without the written consent of the other . . . ." Doc. #257-41 at 11. This restriction would "apply both during the period of [the] Agreement and for a period of five years after its termination." *Ibid.*

Another part of the agreement, Paragraph 3 of Section VII, provided as follows:

Upon expiration or termination of this Agreement, each party shall have the right to use its own proprietary data, but shall not knowingly make use of data proprietary to the other unless such data is in the public domain, otherwise than through a breach of the provisions of this agreement.

*Id.* at 12. This latter provision was not subject to a time limitation.

By its terms, the agreement was to expire in 1986. The parties, however, extended the agreement for an additional 5-year term, and there is no dispute that the agreement actually expired in 1991, aside from any remaining confidentiality obligations imposed by the aforementioned provisions.

Eventually, CECO was awarded a contract for a particular aircraft engine—the T55 engine—and, pursuant to the terms of the 1979 agreement and a subsequent agreement between the companies executed in 1984, they worked together through much of the 1980s to develop a FADEC system for that engine. The T55 engine was manufactured by Honeywell International, Inc. ("Honeywell") for use on Chinook helicopters manufactured by Boeing for the United States

3

Army ("U.S. Army") and the Royal Air Force ("R.A.F.") of the United Kingdom.[4]

Chinook helicopters are used for heavy lifting with two main rotors and two engines. The FADEC system developed by HSDE and CECO needed to have two DECUs—one for each engine. The dual DECUs on the Chinook operate in tandem—that is, they work together and necessarily communicate with each other.

CECO created—with input from HSDE, Honeywell, and other entities—the control algorithms for the T55 FADEC system that would be used on Chinook helicopters. CECO set forth these T55 FADEC system control algorithms and functional specifications in a document that it authored numbered 111613, the most recent version of which is revision J and is referred to by the parties as the "J Spec." The J Spec describes the functions to be performed by both the metering unit and the DECU, and the algorithms that the DECU must compute to control the flow of fuel to the engine and to record engine data performance.

The parties in this litigation agree that the J Spec was written with input from HSDE and Honeywell, but they also acknowledge that CECO, as system design authority for the T55 FADEC, is the only entity that can revise the J Spec. *See* Doc. #257-1, ¶¶ 47, 55. The J Spec contains a legend stating: "This document contains information which is the property of [CECO] . . . ." Doc. #198 at 25. HSDE does not have any proprietary markings on the document. Doc. #257-1, ¶ 52.

Pursuant to the 1979 and 1984 agreements, HSDE designed the hardware, software, and operating system of the DECU to meet the requirements set forth in the J Spec. HSDE spent millions of dollars and took many years to develop the DECU. At some point—apparently later in the 1980s—the DECU went through a period of U.S. Army testing and qualification, *see* Doc.

---

[4] At the time, the company now known as Honeywell was named Lycoming, and that company has apparently undergone several other name changes in the intervening decades. *See* Doc. #257-1, ¶ 38

#257-1, ¶ 79, and by 1989 or 1990, HSDE was filling CECO-issued purchase orders for

DECUs.[5] CECO would then mark up the DECUs and sell them to the U.S. Army, the R.A.F.,

and other customers as part of the complete FADEC system.

      This arrangement—HSDE's manufacturing DECUs and selling them to CECO, who then

sold them to end users as part of the complete T55 FADEC system—continued for decades and

was apparently very profitable for both companies and their successor entities. While there is

considerable dispute about whether HSDE and CECO were bound by any contractual provisions

after April 1991 (when the 1979 agreement expired), there is no disagreement that the parties

continued to do business in this manner.[6] The U.S. Army has purchased hundreds of DECUs

over the years, and HSDE and its successors—the sole manufacturers, suppliers, and repairers of

the device—have had a monopoly on what was until quite recently the only digital electronic

control device approved for flight on a Chinook helicopter. The DECU business was quite

important to HSDE and its successors. At oral argument, ATEC's counsel explained that, at its

height, DECU sales and repair accounted for approximately 50% of ATEC's (HSDE's eventual

successor's) business.

      At times, the DECU software was modified and improved. For example, in the mid-

1990s, the R.A.F. requested that HSDE add certain labels or headings to the software

documentation for the R.A.F. version of the DECU software. HSDE did so, and this exercise was

called the "redocumentation" because it involved HSDE "re-documenting" the already-

developed DECU software documentation.

---

[5] The parties disagree about what terms and conditions governed these purchase orders and more generally about the overall legal relationship between them in this time period, but it is undisputed that these DECU purchase orders were issued and filled. *See generally* Doc. #257-1, ¶¶ 83–86.

[6] The parties had discussions about negotiating another contract, but there were many disputed issues, and the parties never reached a new agreement. Doc. #257-1, ¶ 73. GPECS claims that after April 1991 HSDE and CECO did business strictly on a purchase order basis, while ATEC contends that there was an "inter-company

HSDE's work "re-documenting" the R.A.F. version of the DECU software led to an update of the U.S. Army's version of the DECU software. In April of 1996, HSDE issued a proposal to CECO for a so-called "block one change"—essentially, another "redocumentation"— to the U.S. Army's version of the DECU, based on the work that HSDE had recently done for the R.A.F. *See* Doc. #257-40. Sometime later in 1996, perhaps around November, the relevant entities—the U.S. Army, Honeywell, Boeing, CECO, HSDE, and others—agreed that HSDE would make the "block one changes" to the software, incorporating software modifications with improved design and test documentation. HSDE prepared the "block one changes" to the software and submitted the updated DECU software package to CECO pursuant to purchase orders executed in 1996 and 1997.[7] CECO then distributed the updated DECU software package to the U.S. Army, Honeywell, and Boeing. The "block one change" package (hereafter referred to as the "redocumentation") that HSDE produced and that CECO distributed consisted of approximately 24 DECU software design documents, some several hundred pages long, that set forth all of the details of the DECU software (other than the source code) for the U.S. Army version of the DECU.

In the years since the "redocumentation," both HSDE and CECO have undergone ownership changes. In 1999, a company called Goodrich Corporation acquired CECO and named this new subsidiary Goodrich Pump and Engine Control Systems, Inc. ("GPECS"). HSDE underwent several ownership changes as well, and by the early 2000s, HSDE's aero/avionics assets (including all DECU-related assets) were placed within VT Engine Controls ("VTEC"), a

---

agreement" which governed the business relationship between the companies. *See* Doc. #182, ¶ 74; Doc. #257-1, ¶ 74.

[7] The parties disagree as to what terms and conditions governed these purchase orders. *See generally* Doc. #257-1, ¶¶ 94–101. This issue is not material to my resolution of the statute of limitations issues.

subsidiary of British corporation Vosper Thornycroft.[8] Then, in 2004, plaintiff ATEC—a new entity created by two VTEC executives, Terry Madden and Andrea Hough—purchased all VTEC assets except the intellectual property rights in the DECU. As part of the transaction, ATEC entered into a licensing agreement pursuant to which ATEC paid VTEC a royalty on all DECUs sold by ATEC. ATEC also obtained an option to purchase the DECU intellectual property rights (the sole remaining assets of VTEC), and ATEC exercised this option in 2007.

To this day, ATEC—and only ATEC—manufactures and repairs DECUs. But, as discussed below, the DECU is no longer the only engine control device used on Chinook helicopters.

### 2.     The EMC-100

In 1999, the U.S. Army awarded GPECS a contract to begin the development of a "universal control"—an electronic control unit that could be used on multiple helicopter engines. By 2002, however, the "universal control" (also called "universal governor") program had been directed to one specific helicopter: the Chinook. In that year, the U.S. Army issued GPECS a "Statement of Work" that "define[d] the requirements for a program to design, develop, and qualify a dual channel Electronic Control Unit (ECU)" to be used on the T55 Chinook helicopter program. Doc. #223 at 5. This electronic control unit would eventually become known as the EMC-100.

The U.S. Army's Statement of Work required that the EMC-100 "provide a drop-in replacement for the T55[] engine Digital Electronic Control Unit (DECU) for the Chinook applications." *Ibid.* Both ATEC and GPECS agree that this statement "mean[t] that the EMC-100

---

[8] For a period of about a decade—from 1994 to 2004—the aero/avionics assets of HSDE were apparently within various subsidiaries of Vosper Thornycroft. *See* Doc. #257-1, ¶ 4. For the sake of clarity (and because any distinction is immaterial to my resolution of the statute of limitations issues), I only discuss VTEC—the last Vosper Thornycroft subsidiary—and do not refer to any of the other subsidiaries that may have owned or controlled former

had to be in the same form as a DECU, fit in the same location on a Chinook helicopter as a DECU, and perform the same functions as a DECU." Doc. #257-1, ¶ 112. The Statement of Work further mandated that the interface of the EMC-100 be the "[s]ame as [the] current DECU," with "[n]o change in existing electrical installation," a "similar" "electrical load," and the "[s]ame physical mounting." Doc. #223 at 7.

The Statement of Work further required that the EMC-100 be fully operationally compatible with the DECU—that an "[a]ircraft [must be able to] be operated with one DECU and one [EMC-100] with no negative impact on operation." *Ibid.* Nevertheless, the Statement of Work required that the EMC-100 be different from and, in many ways, more advanced than the DECU. Doc. #257-1, ¶¶ 115-16.

There is no dispute that, when creating the EMC-100, GPECS referenced or copied certain DECU design information from the J Spec and the "redocumentation," although the parties disagree on the extent of referencing/copying. GPECS's engineers used the J Spec as a "starting point" for designing the EMC-100's control functional specifications. Doc. #257-1, ¶ 119. And they also "referred to" (GPECS's terminology) or "copied" (ATEC's preferred term) DECU design information from the "redocumentation." *See* Doc. #182, ¶ 122; Doc. #257-1, ¶ 122. GPECS's engineers referred to these documents with some regularity for nearly a decade— from about 2003 to 2011. See Doc. #257-21 at 9–11. Yet the device GPECS created—the EMC-100—is no mere copy of the DECU. Both parties agree that "the EMC-100 contains different hardware, electronic circuitry, and operating system from the DECU . . . ." Doc. #257-1, ¶ 121. The EMC-100 went into production in late 2008 and, by 2009, the U.S. Army was flying Chinooks containing both EMC-100s and DECUs—sometimes operating together in tandem on the same aircraft.

HSDE (and future ATEC) assets during this time period.

3.      **ATEC/VTEC Knowledge of the EMC-100**

For statute of limitations purposes, the critical inquiry is when did ATEC (or its predecessor, VTEC) become aware of the EMC-100 program and GPECS's referencing/copying of DECU design information. Here, the facts must be evaluated in light of ATEC's filing of this lawsuit on September 28, 2010. Because the longest potentially applicable statute of limitations that might apply in this case is six years, it is vital among other concerns to understand what ATEC knew with respect to GPECS's alleged copying activity as of late September 2004—six years before ATEC filed this lawsuit.

a.      *Evidence re ATEC's Knowledge of Copying Prior to September 28, 2004*

The first evidence in the record of any discussion between the parties regarding a DECU replacement comes from the minutes of a July 1999 meeting between VTEC and CECO executives. According to notes from that meeting, "CECO asked what plans [VTEC] ha[d] to develop a new generation DECU[.] [VTEC executive] Pat Maguire replied that this is not currently part of [VTEC]'s investment strategy. CECO asked [VTEC] to give consideration to the question." Doc. #257-73 at 3.

ATEC/VTEC executives have testified in deposition that they first heard of the "universal governor" program in the early 2000s. *See* Doc. #257-1, ¶ 128. The record reflects a meeting held with executives from VTEC and its longtime business partner—by now renamed GPECS— in December 2001. According to minutes from that meeting prepared by VTEC (and later ATEC) executive John Brightman, GPECS informed VTEC "that they had a contract with [the] US army to develop a new helicopter controller." Doc. #227 at 3. GPECS even stated that the new "universal governor" could go on Chinook helicopters, explaining that its "mission was to develop a 'true universal controller'—looking at applications for other helicopter programmes *in*

*addition to the Chinook*." *Ibid.* (emphasis added). Still, the minutes indicate that GPECS downplayed the universal governor's potential application to the Chinook program by noting that "[GPECS] stated that realistically with the Chinook program being so advanced and working well, the universal controller was likely to be diverted to other helicopter programmes." *Ibid.*

Even before this formal meeting of December 2001, some executives at VTEC were aware of the "universal control"/"universal governor" program. Around 2000 or 2001, John Brightman and John Frost—both VTEC (and later ATEC) executives who were also present at the December 2001 meeting—made a visit to GPECS's facilities in Hartford. While there, they saw something very familiar: a device in GPECS's foyer that appeared "identical" to the DECU. John Frost testified:

> [T]he first time that I visited GPECS in Hartford, Connecticut, they had a large glass display cabinet in their foyer, and it had all the different controllers and products there. John Brightman and myself noticed that they had a controller that looked in its appearance identical to our T55 DECU, and as I recall it was the first time that John had seen that too. It was identical to look at, and even the connectors, the position of the connectors were identical to our T55, if not identical then very similar.
>
> So we asked [GPECS executive] Dick Bowtruczyk and the guys there as to what it was. . . . [W]e . . . establish[ed] . . . that they claimed it was a universal governor, and that they had had a contract from the US Army to develop this universal governor, and it was predominantly for the combat aircraft, which was at that time the Black Hawk and the Apache helicopters.
>
> We asked whether there was any probability that it was going anywhere else, and they did say that there was a long-term—a much longer term future possibility that when Boeing developed the heavy lift Chinook it could possibly be used for that.

Doc. #257-8 at 11–12. Frost emphasized that while he saw that "the universal governor was the same shape [and] had the same electrical connections," he had "no idea" "what the hell was inside it and what its function was." *Id.* at 27. He also noted that GPECS "seemed . . . reluctant to talk about [the universal governor]." *Id.* at 12.

GPECS did not display any reluctance, however, when it issued a press release in July of the following year, 2002, announcing its "Next Generation Universal Control Technology" program. *See* Doc. #199 at 38. The release stated that GPECS had been awarded "contracts to supply engine control systems" for the U.S. Army, Honeywell, and other entities. *Ibid.* The release even trumpeted the fact that "[t]he first production deliveries will take place in 2004 *for the US Army's Chinook Helicopter engine application . . . .*" *Ibid.* (emphasis added).

Substantial documentary evidence indicates that VTEC executives (and later ATEC executives) were concerned about GPECS's activities for two reasons. First, VTEC/ATEC worried that the "universal governor"/"universal control"/EMC-100 would compete with and eventually replace the DECU. Second, VTEC/ATEC was concerned that GPECS had copied DECU intellectual property in order to create this new device.

As to the first concern—whether the GPECS EMC-100 would *compete* with the DECU—there is record evidence indicating that, as early as 2002, GPECS informed VTEC that the EMC-100 would eventually replace the DECU on Chinook aircraft.[9] But other competent evidence—which I must credit as true for purposes of considering whether to grant summary judgment against ATEC—suggests that GPECS engaged in a pattern of misrepresentations in response to ATEC's queries about its competitive intentions. According to deposition testimony (all from current ATEC executives), at various times over the years GPECS executives falsely assured VTEC/ATEC that the EMC-100 would not go on the Chinook, or that it would go on future yet-to-be-developed versions of the Chinook (which would be incompatible with the DECU), or that

---

[9] For example, in an October 2002 email from VTEC to GPECS, VTEC executive John Brightman stated that at "our last meeting a few months ago . . . [GPECS] stated that the universal governor may replace our business . . . ." Doc. #257-80 at 3. And in another email in the same chain, Brightman told GPECS: "We understand that at some time in the future our DECU will be replaced by your Universal Governor and as such need a clear statement by yourselves of your intentions." *Id.* at 2. In connection with this lawsuit, Brightman testified that he made this statement because, at times, GPECS would threaten to bring the universal governor onto the Chinook to replace to

it would not replace the DECU in Chinook helicopters where the DECU was already in use.[10]
*See* Doc. #257-1, ¶ 149.

Turning to the second VTEC/ATEC concern—whether GPECS was *copying* DECU
intellectual property—documentary evidence from ATEC's own files indicates that the company
sought legal advice regarding DECU intellectual property rights ownership as early as February
2003 and, in the years that followed, they referred to the "universal governor"/EMC-100 as a
"direct copy" of the DECU and noted that GPECS had "cloned" design elements from the
existing DECU to create this new device. *See generally* Doc. #257-1, ¶¶ 141–153. But, until
2010—the year this lawsuit was filed—ATEC never approached GPECS with their concerns
regarding the copying of intellectual property.

A "February 2003 Progress Report" drafted by John Brightman provides the first
indication that VTEC/ATEC was taking an active interest in DECU intellectual property in light
of GPECS's new "universal governor" program. The report contains a section devoted to "risk[s]
[and] opportunities to the T55 business." Doc. #201 at 24. In that section, under a subheading
entitled "[GPECS] Universal Governor," VTEC noted that "[l]egal advice on the DECU s/w
[software] IPR [intellectual property rights] ownership is still in progress." *Ibid.* In connection
with this lawsuit, John Frost—then the general manager of VTEC—testified that "there was not
anything particularly in 2003 that triggered [him] to question [VTEC's] intellectual property
rights in any of its products." Doc. #257-8 at 5. Rather, Frost claims that VTEC consulted with

---

the DECU in order to obtain better pricing on DECUs. Doc. #257-6 at 39–40.

[10] Andrea Hough, a VTEC (and later ATEC) executive, testified that
It was repeatedly told to us over the years from the first conversation regarding its predecessors of
the Universal Governor by [various GPECS executives], anybody that we dealt with, you know,
that was always—whenever we questioned are we going to be replaced on the 47-D [the version of
the Chinook compatible with the DECU] the answer was always no. Originally it was the
Universal Governor wouldn't even be on the Chinook. Then it would be the Universal Governor
which never came to be, was then going to be considered for the Chinook and over time that got
replaced by the [EMC-100], which was only going to be on the later versions of it.

an intellectual property lawyer on DECU intellectual property issues because "[he] didn't have the background, history or knowledge, and not just for the T55, [and he] wanted to review and have an opinion on what [VTEC's] protection was on hydraulic valves, on Gnome controllers and indeed on the T55 controller." *Id.* at 3. The "February 2003 Progress Report" does not, however, contain any reference to possible legal issues with intellectual property rights in any of these other products—only the DECU. Additionally, neither John Frost nor any other ATEC/VTEC witness has explained why a note regarding DECU intellectual property would appear under the heading "[GPECS] Universal Governor."

A little over a year later, in March of 2004, ATEC executive Andrea Hough received a fax from someone named Andrew Wilson, a consultant at an entity called the JGW Group.[11] The fax included a printout of a GPECS advertisement for the "universal control" device, and on the cover page was a note to Andrea Hough stating in part, "Is this the engine control system that [GPECS] is pushing, that is competition to you?" Doc. #201 at 27–28. Andrea Hough showed the fax to VTEC General Manager John Frost, who then sent an email to Wilson in response to the fax. In his email, Frost stated in part:

> I thought it would be useful for you to know that we established knowledge of this product two years ago & during our frequent liaison visits to Hartford tried to offer a manufacturing service to build it for them, recognising that this is a *direct copy* of our T55 DECU.

*Id.* at 31 (emphasis added).

Just a few months later, in August 2004, VTEC sold all its aero assets (except the DECU intellectual property rights that it retained until 2007) to ATEC, and in connection with that sale, VTEC issued a disclosure letter to ATEC. The letter was received and signed in turn by Terry

---

Doc. #257-13 at 38.

[11] No one seems entirely sure about the JGW Group's connection to VTEC, but John Frost testified that he thinks the JGW Group was a "consultancy group that Vosper Thornycroft [VTEC's parent company] retained." Doc.

Madden, who—like Andrea Hough, John Frost, and John Brightman—was first an executive at

VTEC and later an executive at ATEC. The letter that Madden received candidly declared

VTEC's belief that GPECS had unlawfully copied VTEC's information:

> [VTEC] believes that GPECS (its customer for the T55 Product) has developed a product (the Universal Governor) *which has copied, without permission, all or part of the T55 IPR*. [VTEC] has sought external legal advice on this subject and [VTEC] may choose to challenge GPECS in the future should this product become a threat to the use of the T55 IPR in the Business (provided that [ATEC] has not exercised its option to acquire the T55 IPR pursuant to the Option Agreement).

Doc. #231 at 6 (emphasis added).

At a deposition in connection with this lawsuit, Terry Madden testified about that

paragraph in the 2004 disclosure letter as follows:

> Q. Is that a correct statement, that VTEC believes that GPECS' customer for the T55 product has developed a product, the universal governor, which has copied, without permission, all or part of the T55 IPR?
> A. At this distance from the document, in time, I think the word "believes" is wrong, but other than that it is correct.
> Q. What do you mean, the word "believes" is wrong?
> A. Belief implies to me something you know rather than something you suspect, so I would have been happier in hindsight with the word "suspect" in there.
> Q. With the word "belief", if the word "believe" means know as fact, then the first sentence is not correct, but if the word "believes" means suspects, then the first sentence is correct?
> A. Yes.

Doc. #257-15 at 66–67. Yet at other times in his deposition, Madden downplayed the notion that

he had any concerns about GPECS's potential usage of DECU intellectual property, stating, for

example:

> I put [this paragraph in the disclosure letter] down [because of] the original query raised by John Frost some years before. And having looked at many of these disclosure documents, everybody puts anything and everything that they think might ever, however unlikely, become an event into that disclosure document. And the view we put at that point was that it was another one of those. We had no

---

#257-8 at 30.

concerns.

*Id.* at 64.

By the following month—September of 2004—the VTEC aero assets (except for the intellectual property rights in the DECU) had been sold to ATEC. In connection with this litigation, ATEC produced from its own files a document titled "Company Review" that is dated from early in September 2004.[12] *See* Doc. #201 at 34–43. Viewing the facts in the light most favorable to ATEC, I will assume that this document was not written by anybody at ATEC but by a third-party contractor, consultant, or advisor. The first page lists Terry Madden and Andrea Hough as contact people, and the document sets forth the following description of the GPECS product as a "plug and play" replacement for the DECU that infringes on ATEC's intellectual property rights:

> Whilst the T-55 DECU is currently having a large Production run for the Chinook upgrade Programme, over the next two years, [GPECS] ha[s] been developing their own Universal Governor, under US Army funding, which they claim could be used in place of the AT Engine Controls Limited DECU (even on the same

---

[12] Notwithstanding the fact that ATEC produced this document from its own files, ATEC has argued—both in its memorandum in opposition to GPECS's motion for summary judgment and at oral argument—that this document is "unauthenticated" because it is "unsigned" or is a mere "draft." I am not persuaded. It is true that evidence submitted at the summary judgment stage must be capable of being "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). And it is well established that, in order to be admissible, evidence must be properly authenticated—that is, there must be some "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). But "the bar for authentication of evidence is not particularly high," *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (internal quotation marks and citation omitted), and a document can be authenticated in many ways, *see* Fed. R. Evid. 901(b) (setting forth a non-exhaustive list of ways that evidence may be authenticated). One such way—at least at the summary judgment stage—is by the mere act of production, which implicitly authenticates a document. *See, e.g.*, *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982) ("Just as [the defendant] could have identified the records by oral testimony, his very act of production was implicit authentication."); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008) ("emails . . . properly authenticated to the extent that they were produced . . . by [party challenging authenticity] itself during discovery"), *aff'd*, 587 F.3d 132 (2d Cir. 2009); *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (defendant "implicitly authenticated . . . documents by his act of production"). Here, there is no dispute that ATEC produced the "Company Report" from its own files, implicitly authenticating the document. Moreover, for purposes of trial, I see no reason why this document could not be authenticated simply by the testimony of a records keeper at ATEC, who would presumably testify as to what both parties already acknowledge: that this document came from ATEC's own records. I also note that, while this document is obviously probative evidence of ATEC's knowledge of the "universal governor"/EMC-100 program, ATEC's contemplation of legal action against GPECS for copying its DECU intellectual property, and ATEC's motive for delaying any legal action, it alone is not dispositive in my analysis of the statute of limitations issue. In other words, my ruling would be the same even if I excluded this document from consideration.

airframe/engine as the AT Engine Controls Limited DECU)—as a Plug and Play replacement. However, it is less likely that the Customer will want to pay for new Units (and the Airframe/Engine Certification Programme) once it has initially Purchased the AT Engine Controls Limited DECU. If they did buy the [GPECS] Unit, then AT Engine Controls Limited would consider a lawsuit, as [GPECS] (as their own Customer for the DECU) would have found it hard to prove that their own unit is a Plug and Play replacement without infringing on the Intellectual Property Rights of AT Engine Controls Limited. Also, by that time, AT Engine Controls Limited would already have made the sales on the initial units, so the effect on its ongoing business would not be as critical.

*Id.* at 38.

b.      *Evidence re ATEC's Knowledge of Copying After September 28, 2004*

A couple years later, in 2006, ATEC Chairman Terry Madden drafted an email to VTEC (which still owned DECU intellectual property rights at the time) stating the company's view that GPECS had "cloned" DECU's design information and that the "whole point of [the EMC-100's] development" by GPECS was to serve as a "plug in replacement for the DECU":

Whilst the [EMC-100] may be seen as a migration . . . this is because we think [GPECS] cloned some of the design from the existing DECU. We had thought of asking VT[EC], as IPR owner, to take this up with them. There are no parts of the current DECU in the FADEC system going forward . . . . The [EMC-100] is a plug in replacement for the DECU, that was the whole point of its development. The [EMC-100] will be manufactured in the US by [GPECS] (mandated by US Government) and the production facilities are in place.

Doc. #232 at 2.[13] There is nothing to indicate that Madden had only recently come to the conclusion that GPECS had cloned the DECU design.

Years later, in connection with this litigation, Terry Madden explained this email as follows: "What I was saying here was that Goodrich took those elements of the design that it owned that were embedded in the existing DECU in the [EMC-100]." Doc. #257-15 at 72–73. If this explanation were to be credited (that GPECS had copies of only those elements "that it

---

[13] There is no indication that this draft email was ever actually sent, but there is no doubt that Terry Madden wrote this draft, and that he sent the draft to another ATEC executive, Managing Director Andrea Hough. *See* Doc. #232 at 2.

owned"), then it would make no sense for the email to further state that "VTEC, as IPR [intellectual property rights] owner, [should] take this up with" GPECS.

In September of 2008, ATEC was told directly by a U.S. Army representative that the Army had instructed GPECS that its new control unit needed to be able to work alongside a DECU on the same aircraft. *See* Doc. #257-1, ¶ 159; Doc. #257-3, ¶ 9. Despite this news, ATEC did not ask GPECS whether its intellectual property had been used by GPECS to create the new controller.

It is undisputed that "ATEC . . . did not approach GPECS concerning it suspicions that GPECS had misappropriated its information until 2010." *See* Doc. #257-1, ¶ 159. On January 11th of that year, GPECS received a letter from a third party reporting that a Chinook helicopter had been tested with an EMC-100 controlling one engine and a DECU controlling the other engine. "This," ATEC Chairman Terry Madden claims, "was the first time [ATEC] had a firm fact [that GPECS copied DECU intellectual property to design the EMC-100] instead of suspicion." Doc. 257-4, ¶ 14.

### 4. This Litigation

On September 28, 2010, ATEC filed this lawsuit against GPECS. In its amended complaint—currently the operative complaint in this action—ATEC sets forth the following six causes of action, all arising under Connecticut state law: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) tortious interference; (5) misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 31-51 *et seq.*; and (6) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*[14] The crux of ATEC's claims is its

---

[14] *After* the parties filed these cross-motions for summary judgment, ATEC filed a motion to amend its complaint—in spite of the fact that Judge Bryant (who formerly presided over this case) denied a prior motion by

contention that GPECS's copying of information from the J Spec and the "redocumentation" was a violation of the 1979 agreement (notwithstanding the fact that the J Spec was marked as proprietary to CECO and the fact that the "redocumentation" was created after the 1979 agreement expired).

The parties have filed cross-motions for summary judgment. ATEC moves for partial summary judgment on certain elements of its CUTSA claim and on its CUTPA claim, and GPECS moves for summary judgment on all of ATEC's claims. Among a large number of arguments raised in its summary judgment motion, GPECS contends that ATEC's claims are barred by the applicable statutes of limitations.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Gr., LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S.

---

ATEC to amend its complaint just over three months earlier. I have reviewed both the operative complaint (Doc. #12) and ATEC's new proposed amended complaint (Doc. #263-1). Both complaints raise the same causes of action, and the factual allegations in the respective complaints are sufficiently similar—for the most part, identical—such that any distinctions would be immaterial to my resolution of the pending cross-motions for summary judgment. In other words, my ruling on the summary judgment motions would be the same regardless of which complaint governed the litigation. Accordingly, I decline to address ATEC's motion to amend the complaint (Doc. #263) and will deny it as moot in view of my granting of GPECS's motion for summary judgment on the entirety of

Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Summary judgment is an appropriate method for determining whether an action is barred by the applicable statute of limitations. As the Second Circuit has noted, "a statute of limitations defense lends itself 'to proof required by Rule 56 and therefore [may be] asserted successfully' on a motion for summary judgment," provided, of course, that there are no genuine issues of fact material to the defense. *BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 609 (2d Cir. 1996) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2734, at 419 (1983)). Where, as here, a federal court adjudicates state law disputes pursuant to its diversity jurisdiction, it is the "'state statutes of limitations [that] govern the timeliness of state law claims', and state law 'determines the related question[] of what events serve . . . to toll the statute of limitations.'" *Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990) (quoting *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir. 1989)).

ATEC's first three claims—for breach of the 1979 contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), and unjust enrichment (Count Three)—are contract-based claims and are therefore governed by Connecticut's six-year limitations period for contractual claims.[15] *See* Conn. Gen. Stat. § 52-576(a) ("No action for an

---

ATEC's claims.

    [15] GPECS argues that ATEC's claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment are subject to the three-year period prescribed in Connecticut's general tort statute of limitations, Conn. Gen. Stat. § 52-577. While the distinction is immaterial here (the claims would be time barred under either limitations period), I am not persuaded. I recognize that some older District of Connecticut cases concluded that a breach of the implied covenant of good faith and fair dealing was an intentional tort covered by §52-577. *See Kent v. AVCO Corp.*, 849 F. Supp. 833, 835 (D. Conn. 1994); *Alexandru v. Ne. Utilities Serv. Co.*, 1997 WL 766885, at *4 (D. Conn. 1997). But the Connecticut Appellate Court has since concluded to the contrary, holding that such claims are subject to the six-year limitations period for contract claims. *Bellemare v. Wachovia Mortgage Corp.*, 94 Conn.

account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues . . . ."). This action was filed on September 28, 2010, and so any contract-based claims that accrued prior to September 28, 2004, are untimely, absent tolling.

When does a contract-based claim accrue? Under Connecticut law, "[i]n an action for breach of contract . . . the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 150, 156, 464 A.2d 18 (1983) (quoting *Kennedy v. Johns-Manville Sales Corp.*, 135 Conn. 176, 180, 62 A.2d 771 (1948)). This is the case regardless whether a plaintiff was aware or unaware that an injury has occurred. *Ibid.* (noting that "ignorance of the fact that damage has been done does not prevent the running of the statute" and also noting that "the application of [this] rule may result in occasional hardship") (internal quotation marks omitted). Therefore, "'[t]he true test for determining the appropriate date when a statute of limitations begins to run is to establish the time when the plaintiff first successfully could have maintained an action.'" *Rosenfield v. I. David Marder & Assoc., LLC*, 110 Conn. App. 679, 686, 956 A.2d 581 (2008) (quoting *Garofalo v. Squillante*, 60 Conn. App. 687, 694, 760 A.2d 1271 (2000)); *see also Amoco Oil Co. v. Liberty Auto and Elec. Co.*, 262 Conn. 142, 150, 810 A.2d 259 (2002) (noting "the basic principle of contract law that accrual is measured from the point in time when the plaintiff first could have

---

App. 593, 610, 894 A.2d 335 (2006) ("claim brought pursuant to a contract, alleging a breach of the implied covenant of good faith and fair dealing, sounds in contract . . . [and] is therefore subject to the six year contract statute of limitations as provided in § 52–576"), *aff'd on other grounds*, 284 Conn. 193, 931 A.2d 916 (2007). As for ATEC's unjust enrichment claim, such a claim is "an equitable cause of action," and so "the court may exercise its discretion in determining the applicable statute of limitations." *Piazza. v. First Am. Title Ins. Co.*, 2007 WL 988713, at *2 (D. Conn. 2007). Where the unjust enrichment claim is based on the same conduct as a "legal" claim (such as a breach of contract claim), courts applying Connecticut law generally apply the legal action's statute of limitations. *See, e.g.*, *In re Trilegiant Corp., Inc.*, 2014 WL 1315835, at *4 (D. Conn. 2014) (citing cases). Here, ATEC's unjust enrichment is based on the same conduct as its breach of contract claim—GPECS's allegedly wrongful use of DECU intellectual property to develop the EMC-100, *see* Doc. #12, ¶¶ 34–37—and so I conclude that the claim should be governed by the same six-year limitations period that applies to the contract claim.

successfully maintained an action").

In this case, there does not appear to be any dispute that ATEC's contract-based claims accrued more than six years before this action was filed. ATEC's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment are premised on GPECS's allegedly wrongful use of ATEC's proprietary DECU information to develop the EMC-100.[16] ATEC alleges that the breaches in this case were GPECS's "fail[ure] to protect the confidentiality of [ATEC's] proprietary data and technology" and GPECS's "improper[] us[age of] AT[EC]'s proprietary information and technology to develop a competing engine control unit." Doc. #12, ¶¶ 27-28. There is no doubt that this occurred in 2003 (or maybe even earlier) when GPECS started using the J Spec and the "redocumentation" to design the EMC-100.

Rather than contending that its contract-based causes of action did not accrue until after September 2004, ATEC argues instead that the statute of limitations should be tolled for reasons of fraudulent concealment and under the continuing course of conduct doctrine. I am not persuaded that a genuine fact issue exists in support of either of these grounds for tolling the limitations period.

As to ATEC's first tolling argument, the Connecticut fraudulent concealment statute, Conn. Gen. Stat. § 52-595, provides that "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." The doctrine must be affirmatively pleaded

---

[16] In connection with its claim for breach of the implied covenant of good faith and fair dealing (Count Two of the amended complaint), ATEC also alleges that GPECS "falsely represent[ed] to [ATEC] customers and potential customers that the DECU manufactured and sold by [ATEC] was obsolete." Doc. #12, ¶ 32. I address this allegation below when discussing ATEC's tortious interference and CUTPA claims.

with sufficient "particularity" to satisfy Rule 9(b)'s requirements for allegations of fraud.[17] *See*

Fed. R. Civ. P. 9(b) ("[I]n alleging fraud or mistake a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally.") As the Second Circuit has noted (albeit in an

unpublished disposition), "'[a]llegations of fraudulent concealment [under § 52-595], like

allegations of fraud, must satisfy the pleading requirements of Rule 9(b).'" *Breiner v. Stone*, 122

F.3d 1055, at *1 (2d Cir. 1997) (*unpublished disposition*) (quoting *Halbrecht v. Prudential-

Bache Properties, Inc.*, 1992 WL 336757, at *5 (D. Conn. 1992)); *see also 389 Orange St.

Partners v. Arnold*, 179 F.3d 656, 662 (9th Cir. 1999) (holding that plaintiff can toll Connecticut

statute of limitations in a federal diversity action under § 52-595 only where fraudulent

concealment doctrine is "affirmatively pleaded" and "the circumstances constituting fraud [are

stated] . . . with particularity" in the complaint); *Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp.

2d 255, 265 (D. Conn. 2009) ("[A] claim of fraudulent concealment must meet the heightened

pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure."), *aff'd on other grounds,*

378 F. App'x 109 (2d Cir. 2010). Neither the current operative complaint (Doc. #12) nor

ATEC's proposed amended complaint (Doc. #263-1) even mention "fraud" or "fraudulent

concealment"—let alone plead allegedly fraudulent circumstances with any degree of

particularity. Accordingly, the doctrine is not implicated here.

Moreover, even assuming that fraudulent concealment had been pled in the complaint, I

would still conclude that the doctrine is not available to toll the statute of limitations under these

---

[17] ATEC argues otherwise, contending that while "an affirmative claim of fraudulent concealment must be pleaded with particularity," this is not so where a party "raise[s] facts suggesting fraudulent concealment in response to [a] statute of limitations defense." Doc. #276 at 7. This distinction finds no support in Connecticut jurisprudence. In fact, Connecticut law does not even recognize any affirmative cause of action for fraudulent concealment. *See Baldwin v. Vill. Walk Condo, Inc.*, 2010 WL 5095319, at *13 (Conn. Super. Ct. 2010) ("§ 52-595 does not create a cause of action"). "The only remedy under General Statutes § 52-595 is a tolling of the relevant statute of limitations until the time when the person entitled to sue thereon first discovers its existence." *Campbell v. Town of Plymouth*,

facts. In construing the fraudulent concealment statute, the Connecticut Supreme Court has held

that

> to toll a statute of limitations by way of our fraudulent concealment statute, [plaintiffs] must present evidence that [defendants]: "(1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [plaintiffs'] cause of action; (2) intentionally concealed these facts from the [plaintiffs]; and (3) concealed the facts for the purpose of obtaining delay on the [plaintiffs'] part in filing a complaint on their cause of action."

*Iacurci v. Sax*, 313 Conn. 786, 799–800, 99 A.2d 1145 (2014) (quoting *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105, 912 A.2d 1019 (2007)). These three

requirements are not established by the usual preponderance of the evidence standard, but by

"the more exacting standard of clear, precise, and unequivocal evidence." *Falls Church Group*,

281 Conn. at 105.

Here, ATEC's fraudulent concealment theory is that: (1) GPECS's engineers (and

probably their executives too) had actual awareness of their own use of DECU intellectual

property; (2) they concealed this from ATEC; and (3) "the evidence is sufficient for rational

minds to infer that GPECS' purpose was to delay ATEC's lawsuit until GPECS could raise the

statute of limitations defense, as it has done here." *See* Doc. #257 at 18–19.

There is no evidence whatsoever that GPECS affirmatively concealed its use of the J

Spec and the "redocumentation" from ATEC. ATEC argues otherwise, contending that "the facts

demonstrate a history of active concealment by GPECS," and that "[t]his concealment is

demonstrated by the testimony of the recipients of GPECS' false assurances—John Frost, Terry

Madden, John Brightman, and Andrea Hough." Doc. #257 at 18. But what did GPECS conceal?

To be sure, the evidentiary record contains ample evidence—found in the depositions and

affidavits of the four ATEC executives just mentioned—that GPECS offered misrepresentations

---

74 Conn. App. 67, 83 n. 9, 811 A.2d 243 (2002) (internal quotation marks omitted).

or even affirmative untruths *regarding its competitive intentions. See infra* note 10. But that issue is quite distinct from the conduct that forms the basis for ATEC's three contract claims: GPECS's *copying* of DECU intellectual property to design the EMC-100. There is no indication in the voluminous summary judgment record that GPECS ever engaged in an affirmative act of concealment with regard to its copying of DECU intellectual property. No one at GPECS ever told anyone at ATEC, "No, we are not copying your intellectual property to develop the EMC-100" or otherwise conveyed an impression that it was not using DECU intellectual property. In the absence of any evidence of affirmative concealment, ATEC's fraudulent concealment theory must rest on its alternative argument that GPECS's actions were "self-concealing."[18] *See OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 506–07 (D. Conn. 2007).

There are two requirements for an action to be self-concealing. "First, the violation must be of such a nature as to be 'self-concealing'" in that it "is, by its nature, inherently unknowable." *Id.* at 507. And, "[s]econd, even if the fraud is self-concealing, the plaintiff still must have exercised reasonable diligence to discover the cause of action under the circumstances." *Ibid.*; *see also Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 427 (2d Cir. 1999) ("conclud[ing] that the plaintiff must be ignorant of the facts that the defendant has sought to conceal for the statute of limitations to toll under § 52-595"); *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *5 (D. Conn. 2005) ("plaintiff must . . . establish that the failure to discover the concealment earlier was not the result of any lack of

---

[18] There is apparently no Connecticut appellate authority holding that § 52-595 can be satisfied by a "self-concealing" violation, but the Connecticut Supreme Court has referred to the concept in this context and cited to federal law discussing the doctrine. See *Fichera v. Mine Hill Corp.,* 207 Conn. 204, 215 & n.5, 541 A.2d 472 (1988) (citing *Bailey v. Glover,* 88 U.S. 342 (1874)). Like Judge Kravitz, I assume (without deciding) that the Connecticut fraudulent concealment statute encompasses actions that are "self-concealing," notwithstanding considerable judicial and scholarly criticism of this doctrine. *See OBG Technical Servs.* 503 F. Supp. 2d at 506–07.

24

diligence").[19]

ATEC cannot satisfy this standard. Even assuming that GPECS's actions here were "inherently unknowable," there is no evidence that ATEC exercised diligence—let alone reasonable diligence. "Typically, a plaintiff will prove reasonable diligence by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted." *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *5. ATEC cannot make either of these showings.

ATEC certainly thought about investigating. ATEC's own Chairman, Terry Madden, "believed" (or at least "suspected") in August 2004 that GPECS had "copied, without permission, all or part of the T55 [DECU] IPR."[20] VTEC even consulted an attorney regarding

_____

[19] Several judges of the Connecticut Superior Court have concluded that § 52-595 imposes a "due diligence" requirement on "a plaintiff on inquiry notice" under all circumstances, not just where there is an allegedly self-concealing violation. *See World Wrestling Entm't, Inc. v. THQ, Inc.*, 2008 WL 4307568, at *12 (Conn. Super. Ct. 2008) (citing cases).

[20] The 2004 disclosure letter stated that VTEC/ATEC "believes" that GPECS copied its DECU intellectual property. *See* Doc. #231 at 6. But, as noted above, ATEC Chairman Terry Madden testified in connection with this litigation that the word "suspects"—instead of "believes"—more accurately reflected ATEC's concerns. *See* Doc. #257-15 at 66-67. Either way, ATEC was certainly "on notice" of the issue. I understand that Terry Madden also testified (during the same deposition where he confirmed that in 2004 VTEC/ATEC "suspected" GPECS had copied DECU intellectual property) that ATEC had "no concerns" about the issue, and that "disclosure documents" simply contain "anything and everything that . . . might ever, however unlikely, become an event . . . ." Doc. #257-15 at 64. This self-serving assertion is not credible because it is manifestly at odds with the plain language of the 2004 disclosure letter and, indeed, with all of the documentary evidence in the record.

It is true that "a district court 'generally should not weigh evidence or assess the credibility of witnesses'" when deciding a motion for summary judgment. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104-05 (2d Cir. 2011) (quoting *Hayes v. N.Y. 105 City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). But this rule is not absolute, and the Second Circuit has recognized that a district court properly disregards deposition testimony at the summary judgment stage where "it is so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" it. *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). For example, in *Jeffreys*, the court of appeals affirmed a district court's granting of summary judgment in defendant's favor where "nothing in the record . . . support[ed] plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and . . . no reasonable person could believe [the plaintiff's] testimony." *Ibid*; *see also Christiana Bank & Trust Co. v. Dalton*, 2009 WL 4016507, at *4 (E.D.N.Y. 2009) ("self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence"); *Dzanoucakis v. Chase Manhattan Bank, USA*, 2009 WL 910691, at *8 (E.D.N.Y. 2009) (where "uncontroverted record clearly supports a [particular] finding," then "[p]laintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact"). In order for a district court to reach such a conclusion, the circumstances much be "extraordinary" and the testimony must be "so contradictory that doubt is cast upon [its] plausibility." *Rojas*, 660 F.3d at 106 (internal quotation marks omitted).

I conclude that this case presents the type of extraordinary circumstance discussed in *Jeffreys*. Here, no reasonable juror could credit Madden's contention that ATEC had "no concerns" about GPECS copying DECU

its intellectual property rights in the DECU vis-à-vis GPECS as early as 2003, *see* Doc. #201 at 24, and contemplated a "challenge [to] GPECS in the future should [the EMC-100] become a threat to the use of the T55 IPR in the Business," Doc. #231 at 6. Yet ATEC never launched any investigation. Indeed, "ATEC admits that it did not approach GPECS concerning its suspicions that GPECS had misappropriated its information until 2010," six years later. *See* Doc. #257-1 (ATEC's Local Rule 56(a)2 Statement), ¶ 159. These facts are fatal to ATEC's fraudulent concealment argument.

To be sure, ATEC may well have had legitimate business reasons for declining to address its suspicions regarding GPECS' usage of DECU intellectual property to design the EMC-100. After all, ATEC was making plenty of money on DECU sales and may not have wanted to disrupt the relationship with its longtime business partner by asking accusatory questions. ATEC's own documents suggest that this was its thinking. The 2004 "Company Report" says that "[i]f [customers] did buy the [EMC-100], then [ATEC] would consider a lawsuit. . . . Also, by that time, [ATEC] would have already made the sales on the initial units, so the effect on its ongoing business would not be as critical." Doc. #201 at 38.

ATEC was certainly entitled to make this decision—that is, to decline to sue (or to even ask questions about its suspicions) in order to maintain its business relationship with GPECS, and to wait instead until the modernized EMC-100 became a "threat" and actually cannibalized the DECU market. *See* Doc. #231 at 6. But this decision has consequences for statute of limitations purposes. As the Connecticut Supreme Court has put it, statutes of limitations

---

intellectual property to build the EMC-100 in view of: (1) the contemporaneous documentary evidence produced from ATEC's own files stating in plain language that it considered the EMC-100 to be a "direct copy" of the DECU and that GPECS had "copied" DECU intellectual property; (2) the fact that ATEC contemplated taking legal action against GPECS as early as 2003 for copying its intellectual property; and (3) Madden's own inconsistent testimony, alternately stating that ATEC "suspected" GPECS had copied its intellectual property in the DECU and claiming that it had "no concerns" about the matter.

"'represent a legislative judgment about the balance of equities in a situation involving the tardy assertion of otherwise valid rights: [t]he theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 322-23, 94 A.3d 553 (2014) (quoting *State v. Skakel*, 276 Conn. 633, 682, 888 A.2d 985 (2006)).

"'[T]he fraudulent concealment doctrine [seeks] . . . to avoid unfair application of the statutes of limitations,'" but the theory does not apply when "'[a] plaintiff . . . has not acted reasonably to protect his own interests.'" *OBG Technical Servs., Inc.*, 503 F. Supp. 2d at 508 (quoting Richard L. Marcus, *Fraudulent Concealment in Federal Court: Toward a More Disparate Standard?*, 71 Geo. L.J. 829, 874–75 (1983)). Such a plaintiff "'may not cry foul when his belated claim is barred.'" *Ibid.* (quoting Marcus, *supra*, at 874–75). ATEC may not toll its claims by taking advantage of the fraudulent concealment doctrine.

Nor does the continuing course of conduct doctrine save ATEC's otherwise untimely contract claims. To begin with, the continuing course of conduct doctrine classically applies to torts, and the law of Connecticut is unclear whether the doctrine applies at all to claims based on breach of contract. *See Saint Bernard Sch. of Montville v. Bank of America*, 312 Conn. 811, 834 n.11, 95 A.2d 1063 (2014). In any event, the doctrine is generally limited to when there exists a "special relationship" between the parties or where there have been later wrongful acts:

> [W]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed ... [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be *evidence* of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such wrong. . . . Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission

27

relied upon, there has been *evidence* of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . Thus, there must be a determination that a duty existed and then a subsequent determination of whether that duty is continuing.

*Stuart v. Snyder,* 125 Conn. App. 506, 510–11, 8 A.3d 1126 (2010) (citation and internal quotation marks omitted).

There is only one wrongful act alleged here: the use of ATEC's intellectual property to develop the EMC-100. Moreover, ATEC cannot contend that it has a "special relationship" with GPECS for purposes of the continuing course of conduct doctrine. "Under Connecticut law, it is clear that a regular contractual relationship between business entities . . . does not create a special relationship." *Ride, Inc. v. APS Tech., Inc.*, 11 F. Supp. 3d 169, 187 (D. Conn. 2014) (citing *OBG Technical Servs.*, *Inc.*, 503 F. Supp. 2d at 511).

ATEC nonetheless argues that "as a result of the 1979 agreement, GPECS owes a continuing duty . . . not to use ATEC's intellectual property without ATEC's consent." Doc. #257 at 15. Undergirding this argument are two assumptions: (1) that the 1979 Agreement imposes a duty that GPECS cannot use the J Spec or the "redocumentation," notwithstanding the fact that the former document is marked as proprietary to GPECS and the fact that the latter document was created after the expiration of the 1979 Agreement, and (2) that this obligation lasts in perpetuity—in other words, it *never* expires. Even assuming, without deciding, that I agreed with both of these premises based on the factual record and the applicable law, "the continuing course of conduct doctrine 'has no application after the plaintiff has discovered the harm.'" *Ride, Inc.*, 11 F. Supp. 3d at 187 (quoting *Rosato v. Mascardo*, 82 Conn. App. 396, 405, 844 A.2d 893 (2004)); *see also Flannery*, 312 Conn. at 312–13 (same).

As Connecticut courts have noted, there are sound reasons for this rule. "Upon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force." *Rivera v. Fairbank Mgmt. Props.*, 45 Conn. Supp. 154, 160, 703 A.2d 808 (Conn. Super. Ct. 1997). Moreover, to allow the accrual of a cause of action "to be pushed forward as long as it is claimed that the [wrongful] conduct continued would eviscerate the policies underlying the statute of limitations," because a "plaintiff would be allowed to acquiesce in the defendant's conduct as long as it was convenient to the plaintiff." *Rosato*, 82 Conn. App. at 405.

Moreover, the continuing course of conduct doctrine may not be invoked merely because plaintiff has yet to discover the full scope of harm. As Chief Judge Hall has recently noted, "[t]he harm done need not have been known in its entirety to foreclose the applicability of this doctrine." *Ride, Inc.*, 11 F. Supp. 3d at 187 (citing *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 371 (S.D.N.Y. 2011) (applying Connecticut law) ("The plaintiffs confuse concealment of the *extent* of damage with concealment of the *fact* of damage; the latter may be grounds for tolling, but the former is not.")).

In this case, ATEC had discovered some actionable harm at least by August of 2004, foreclosing any applicability of the continuing course of conduct doctrine. By that time, ATEC suspected that "GPECS . . . ha[d] developed a product (the Universal Governor) which . . . copied, without permission, all or part of the T55 [DECU] [intellectual property rights]." Doc. #231 at 6; Doc. #257-15 at 66–67. ATEC even contemplated taking legal action. The "Company Review" (dated from early the following month, still prior to the six-year limitations period) demonstrates that ATEC knew about GPECS's "Universal Governor," and knew that GPECS

"claim[ed the new device] could be used in place of the AT Engine Controls Limited DECU (even on the same airframe/engine as the AT Engine Controls Limited DECU)—as a Plug and Play replacement." Doc. #201 at 38.

This was "actionable harm" because ATEC believed that it had been injured by use of its intellectual property to develop a new engine controller, and it knew that GPECS was the entity causing the harm. Tellingly, ATEC brought this lawsuit over six years later, in 2010, with little more information than it had way back in 2004. ATEC's harm was as "actionable" in 2010 as it had been back in 2004.

In sum, ATEC's three contract-based claims—for breach of the 1979 contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment—are time-barred on their face and are not rendered timely by virtue of either the fraudulent concealment or continuing course of conduct doctrines.

ATEC's remaining, non-contract-based claims are untimely for similar reasons. ATEC's misappropriation of trade secrets claim (Count Five) under CUTSA is subject to a three-year statute of limitations. *See* Conn. Gen. Stat. § 35-56. The limitations period begins to run "from the date the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Ibid.* The alleged misappropriation in this case is GPECS's use of the J Spec and the "redocumentation," which began around 2003 and continued for nearly a decade. Under these circumstances, where allegedly proprietary information is regularly used for an extended period of time, the "continuing misappropriation constitutes a single claim" for purposes of calculating the statute of limitations. *See ibid.*

To determine when the statute started running for this "continuing misappropriation" claim, the only facts that matter concern when ATEC "discovered" the misappropriation or "by

the exercise of reasonable diligence should have . . . discovered" the misappropriation. *See, e.g.,*

*Times Fiber Commc'ns. Inc. v. Trilogy Commc'ns., Inc.*, 1997 WL 781978, at *3 (Conn. Super.

Ct. 1997) (*unpublished*) (noting that "'the statute of limitations [for misappropriation claims]

begins to run when the claimant has knowledge of facts which would put a reasonable person on

notice of the nature and extent of an injury and that the injury was caused by the wrongful

conduct of another'") (quoting *Catz v. Rubinstein*, 201 Conn. 39, 47, 513 A.2d 98 (1986)).

Also, because the language of § 35-56 comes from a uniform act (the Uniform Trade

Secrets Act) adopted by many jurisdictions, I rely on case law from other jurisdictions

interpreting the same statutory language.[21] Courts interpreting this statute of limitations have

uniformly concluded that the limitations period starts running when "the plaintiff has actual or

constructive notice of facts giving rise to the claim," *see Alamar Biosciences, Inc. v. Difco Labs.,*

*Inc.*, 1995 WL 912345, at *3 (E.D. Cal. 1995) (citation omitted), and that the statute imposes a

duty of investigation on a plaintiff who is suspicious that his or her trade secrets may have been

misappropriated, *see Read & Lundy, Inc. v. Washington Trust Co. of Westerly*, 2002 WL

31867868, at *8 (R.I. Super. 2002) (*unpublished*) ("If a person becomes aware of facts which

would make a reasonably prudent person suspicious, he or she has a duty to investigate further . .

. ." (citation omitted)), *aff'd,* 840 A.2d 1099 (R.I. 2004).

"[T]he universal line of reasoning in Uniform Trade Secrets Act cases provides that the

law impose[s] on plaintiffs a responsibility to take prompt and assertive corrective action with

respect to *all of [their] interests* whenever [they] detect a fracture in a once confidential

relationship." *Wyne v. Medo Indus., Inc.*, 2004 WL 3217860, at *6 (D. Md. 2004), *aff'd*, 119 F.

App'x 571 (4th Cir. 2005) (citation and internal quotation marks omitted). "Courts have rejected

---

[21] This is consistent with the Connecticut legislature's directive that the state's version of the Uniform
Trade Secrets Act, CUTSA, "shall be applied and construed to effectuate its general purpose to make uniform the

the notion that the 'statute of limitations only begins running when a plaintiff can unassailably establish a legal claim for trade secret misappropriation, [as that] would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers "smoking gun" evidence of misappropriation.'" *Ibid.* (quoting *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000)).

With these standards in mind, it is clear that ATEC's misappropriation claim is time-barred because there is no genuine issue of material fact to dispute that, prior to September 28, 2007 (three years before this case was filed), ATEC was aware of facts that put it on notice of GPECS's misappropriation of its intellectual property. By 2004, ATEC suspected that GPECS had "copied, without permission, all or part of" its DECU intellectual property to create the EMC-100. Doc. #231 at 6. In 2006, ATEC considered bringing a lawsuit because GPECS "would have found it hard to prove that [the EMC-100] is a Plug and Play replacement without infringing on the Intellectual property Rights of [ATEC.]" Doc. #201 at 38. Yet ATEC made no attempts to investigate the matter. ATEC tries to argue otherwise, contending that it "did what it could do: Inquire about the nature and status of its longstanding business partner's new device." Doc. #257 at 13. The problem with this argument is that all of ATEC's inquiries were aimed at investigating GPECS's competitive intentions, not at GPECS's allegedly improper use of DECU intellectual property. There is no dispute that, until 2010, ATEC never inquired about whether GPECS was copying DECU intellectual property to create the EMC-100—the allegation that forms the basis for the misappropriation claim. Additionally, even assuming that the fraudulent concealment and continuing course of conduct doctrines could toll CUTSA's statute of limitations, they are not applicable here for all the reasons discussed above in relation to the contract-based claims.

---

law with respect to [the misappropriation of trade secrets] among the states enacting it." Conn. Gen. Stat. § 35-58.

Lastly, ATEC raises two more claims—for tortious interference (Count Four) and for violations of CUTPA (Count Six)—that are also subject to a three-year limitations period. *See* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); *PMG Land Associates, L.P. v. Harbour Landing Condo. Ass'n, Inc.*, 135 Conn. App. 710, 713–14, 718, 42 A.3d 508 (2012) (applying § 52-577 to tortious interference claim); Conn. Gen. Stat. § 42-110g(f) (CUTPA claim subject to three-year limitations period running from "the occurrence of a violation").

To the extent these claims are based on GPECS's misappropriation/copying/referencing of the J Spec and the "redocumentation" to design the EMC-100, those claims are time-barred (and not subject to tolling) for all the reasons discussed above. To the extent these claims are based on GPECS's marketing of the EMC-100 as a replacement for the DECU, see Doc. #12 ¶¶ 38–39, these claims too are untimely. GPECS sent out a press release announcing that the product would go on Chinook helicopters in 2002, and by 2004, ATEC knew that GPECS claimed the unit could be used in place of the DECU.

Finally, to the extent these claims are based on ATEC's allegation that GPECS "false[ly] represent[ed] throughout the industry that the DECU was obsolete," *id.* ¶ 38, there is no evidentiary support for this claim. Apparently recognizing this, ATEC relies in its summary judgment briefing on the theory that "GPECS . . . with[eld] information from ATEC to make GPECS' and ATEC's most significant DECU customer, the U.S. Army, think that the DECU was functionally obsolete," Doc. #268 at 9, and that "GPECS failed to inform ATEC of concerns and issues the U.S. Army had with the DECU in order to create a market and artificially bolster demand for the EMC-100." Doc. #179-1 at 21. These factual allegations—advanced for the first time at the summary judgment stage—are well outside the ambit of either the current operative

33

complaint (Doc. #12) or the proposed amended complaint (Doc. #263-1). It is axiomatic that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (internal quotation marks and citation omitted); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (refusing to consider allegation first mentioned in opposition brief to motion to dismiss); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) (refusing to consider claim discussed in opposition brief to summary judgment motion but "never addressed . . . in the complaint").

## CONCLUSION

For the foregoing reasons, I conclude that ATEC's claims are barred by the applicable statutes of limitations. Accordingly, I GRANT GPECS's motion for summary judgment (Doc. #180), and DENY ATEC's motion for partial summary judgment (Doc. #179). All other pending motions are DENIED as moot.

The Clerk is directed to close this case.

It is so ordered.

Dated at Bridgeport this 18th day of December 2014.


/s/ Jeffrey Alker Meyer
Jeffrey Alker Meyer
United States District Judge